**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

          - against -                **22-cr-409 (JGK)**

JAREL SABLE,                  **MEMORANDUM OPINION**
                                   **AND ORDER**
                **Defendant.**

**JOHN G. KOELTL, District Judge:**

The defendant, Jarel Sable, was indicted on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and (2). Mr. Sable now moves to suppress certain evidence related to this charge -- namely (1) a firearm seized by the Government from a fanny pack strapped to his back and (2) statements he made after his arrest. Sable argues that this evidence was obtained in violation of his constitutional rights.

On July 17, 19, and 31, 2023, the Court held an evidentiary hearing on this motion. The Government presented three witnesses, New York City Police Department ("NYPD") Detective Joseph Parchen, Supervisory Deputy United States Marshal ("Marshal") Stephen Karoly, and Deputy United States Marshal ("Marshal") Morgan Schiff. The defense presented one witness, Investigator Joseph Lively.

Based on all of the evidence, and having assessed the
credibility of the witnesses, the Court makes the following
findings of fact and reaches the following conclusions of law.

**I.**

On June 14, 2022, a Task Force consisting of members from
the United States Marshals Service ("USMS"), as well as NYPD
detectives and a Manhattan District Attorney Investigator, was
assembled for the purpose of locating a suspect at large named
DaJohn Gamble. Tr. 24, 71, 138.

The Task Force began the day with a tactical meeting led by
NYPD Detective Joseph Parchen. Tr. 25, 71-72, 138. Detective
Parchen had over eighteen years of experience in law enforcement
and had participated in thousands of surveillance operations.
Tr. 20-21. Detective Parchen informed the Task Force members
that Mr. Gamble was wanted for a non-fatal shooting and had
previous convictions and run-ins with law enforcement. Tr. 25,
28, 72. Detective Parchen instructed members of the Task Force
to approach Mr. Gamble with caution because of his prior
arrests, which involved robberies, firearms possessions, and
assaults on police officers. Tr. 28-29, 75, 140. Because of Mr.
Gamble's history, Detective Parchen advised the Task Force that
Mr. Gamble was "prone to violence." Tr. 29. Detective Parchen
described him as a "fighter, a fleer, and a shooter." Tr. 75.
Additionally, Detective Parchen described Mr. Gamble's age and

physical attributes to the Task Force. Tr. 25-26, 72. He
described Mr. Gamble as an African American man in his late
twenties, standing approximately 5'3" or 5'4" tall and weighing
approximately 130 pounds. Tr. 26-27, 72, 138. Detective Parchen
also showed the Task Force a photo of Mr. Gamble. Tr. 27, 139.

After the tactical meeting ended, the Task Force conducted
surveillance in the vicinity of 300 East 143rd Street. Tr. 29,
75. Detective Parchen decided on this location based on records
showing that Mr. Gamble had packages shipped to him at an
apartment at that address and used supplemental nutrition
assistance program benefits at nearby bodegas. Tr. 29. Detective
Parchen positioned himself across from 300 East 143rd Street and
remained in his vehicle. Tr. 31. He was the only Task Force
member at that precise spot. Other Task Force members were
situated nearby, and Detective Parchen communicated with them
through point-to-point contact on a radio. Tr. 31, 79, 141.
Sometime later, Detective Parchen observed the defendant from
approximately fifteen to twenty feet away. Tr. 31-32. The
defendant had dropped off his son at his babysitter's home and
was on his way to purchase diapers and a COVID-19 test, when he
stopped to speak to an acquaintance. Sable Decl. ¶¶ 4-5.
Detective Parchen believed the defendant could be Mr. Gamble
because the defendant matched the photo he had of Mr. Gamble and
the location where Mr. Gamble was expected to be. Tr. 32.

3

Moreover, the defendant matched Mr. Gamble's age, facial hair, complexion, and size. Tr. 32, 79, 142. Detective Parchen described the defendant's physical appearance to the Task Force members over the radio and asked them to stop and identify the defendant. Tr. 32-33, 79-80. Detective Parchen remained in his vehicle to maintain his surveillance position. Tr. 33.

Upon hearing Detective Parchen's report, Marshal Karoly, the supervising member of the Task Force who was situated nearby, instructed other members of the Task Force to position themselves closer to the defendant to try to identify him. Tr. 80. Marshal Karoly drove his vehicle closer and got a first look at the defendant, who was wearing a light grey sweatsuit that said "GAP" and a mask that covered the lower portion of his face. Tr. 81-82, 122. At that moment, Marshal Karoly concluded that the Task Force should identify the defendant because he fit Mr. Gamble's physical characteristics and was located in the target area. Tr. 83, 121. Marshal Karoly instructed Task Force members to surround the area. Tr. 84. Then, Marshal Karoly double-parked his vehicle about 25 to 40 feet from where the defendant was standing, exited his vehicle, and began jogging towards the defendant, shouting "police, show me your hands," "police, do not reach for anything," and "police, do not run." Tr. 84-85. Marshal Karoly had his weapon unholstered as he approached the defendant. Tr. 85, 87. As he approached --

4

Marshal Karoly later testified -- the defendant's eyes widened,
and the defendant rocked back as if he would start to sprint.
Tr. 87, 118-19. Marshal Karoly continued to shout directions,
such as "show me your hands" and "do not reach for anything" as
he continued to run towards the defendant. Tr. 87. When Marshal
Karoly reached the defendant, who was facing him, Marshal Karoly
used his left hand to grab the defendant's right shoulder. Tr.
87-88. Marshal Karoly then used his left hand to turn the
defendant away from him and toward the fence behind the
defendant, as Marshal Karoly holstered his weapon with his right
hand. Tr. 88-90. Once Marshal Karoly leaned the defendant
against the fence and pinned the defendant with his body weight,
Marshal Karoly began to pat the defendant down, in the interest
of officer safety. Tr. 90-91. Marshal Karoly testified that he
told the defendant that he was law enforcement, explained that
the Task Force was looking for someone, and asked the defendant
what his name was, but the defendant did not respond. Tr. 89-90.

When conducting the pat-down, Marshal Karoly began at the
defendant's head, pulling down the defendant's hoodie so that he
could see the defendant's hairline and neck. Tr. 91. At that
point, Marshal Karoly noticed a black fanny pack strapped to the
defendant's back. Id. Next, Marshal Karoly placed his right hand
on the defendant's right back and shoulder. Id. Marshal Karoly
testified credibly that, when his hand touched the fanny pack,

he "immediately felt a handgun through the fanny pack." Id. As
to why he knew instantly that it was a firearm he touched,
Marshal Karoly testified that it was:

> Through my training and experience in the last 31 years
> of being in the military and with the Marshals Service,
> I've touched handguns/weapons every day of my life, and
> it was shocking that I first touched the weapon in that
> way. I've never had one carried or discovered a weapon
> that way while doing a patdown. But I immediately, as I
> touched it through the cloth of the fanny pack, which is
> pretty -- it's not very -- there's no padding or anything
> on it, I said, oh, he's got a gun inside there.
> Immediately my brain processed that.

Tr. 93. Marshal Karoly had extensive experience with
firearms. He was a member of the United States Marshals Service
for about twenty-seven years, from 1996 to June 2023. Tr. 57. He
regularly carried a firearm, completed frequent firearms
training, and participated in over 1,000 arrests. Tr. 58-65.
Over the past twenty to twenty-five years, Marshal Karoly had
handled firearms on a daily basis. Tr. 69. Prior to joining the
Marshals Service, Marshal Karoly was a member of a light
infantry unit in the United States Army. Tr. 66-67.

Having felt a firearm in the fanny pack, Marshal Karoly
then yelled that the defendant had a gun, pressed his body
weight against the defendant, and grabbed both of the
defendant's arms in a bear hug. Tr. 92. Marshal Karoly was the
only Task Force member in direct contact with the defendant

throughout the time that Marshal Karoly felt the firearm and was restraining the defendant against the fence. Tr. 94.

The other members of the Task Force then approached with their firearms drawn, and Task Force members handcuffed the defendant. Tr. 94-95. Marshal Karoly removed the fanny pack from the defendant so that the other members of the Task Force could conduct a full pat-down. Tr. 94. Marshal Karoly did not want to leave the fanny pack on the person who was detained. Id. Marshal Karoly did not open the fanny pack to confirm the presence of the firearm because he was sure that it contained a gun, and he did not want to open the fanny pack to disturb any DNA or fingerprints. Tr. 123. At some point, another Task Force member secured the fanny pack. Id. Marshal Karoly testified that, once the defendant was handcuffed, the Task Force tried to identify the defendant, and the defendant told his name to Marshal Brown, another member of the Task Force. Tr. 94-95. Marshal Karoly also testified that the defendant made voluntary statements while he was handcuffed, such as "who called y'all?" "why are you out here?" "why y'all looking for me?" and something about being ratted out and his probation officer. Tr. 95-96.

Marshal Schiff, a Task Force member who was surveilling nearby, arrived after the defendant was handcuffed. Marshal Schiff joined the U.S. Marshals Service in 2020 after serving as a police officer in Washington, D.C., for five years. Tr. 136-

37. Marshal Schiff transported the defendant to the USMS office at the courthouse at 500 Pearl Street. Tr. 96, 143-44. Marshal Schiff reported that the defendant said his name was Jarel Sable. Tr. 144. Marshal Schiff testified that, while he did not ask the defendant any questions, the defendant made several voluntary statements while being transported, including that his probation officer was going to be upset with him and that he carried the firearm for protection because he had been robbed previously. Tr. 144-45.

After arriving at the courthouse, Marshal Schiff processed the defendant by taking the defendant's fingerprints, pictures, and information, and logging them into the USMS database. Tr. 145. Marshal Schiff testified that the defendant was African American, stood approximately 5'6" tall, weighed 150 pounds, and was born on March 25, 1993. Tr. 148-49. Then, in preparation for questioning, Marshal Schiff testified that he printed out a card that advised individuals of their Miranda rights, an official USMS form. Tr. 150-51. Marshal Schiff also testified that he prepared an outline, the first item of which is "rights," and set up a camera for questioning. Tr. 150, 152, 154.

Along with Marshal Tracy Amaladas, Marshal Schiff interviewed the defendant. Tr. 153-54. Marshal Schiff began by building rapport through human questions and then reading the defendant his Miranda rights. Tr. 154. Marshal Schiff testified

8

credibly that the defendant waived his Miranda rights and agreed
to speak with Marshal Schiff and Marshal Amaladas. Tr. 154. The
defendant stated that he was on federal probation, that he
carried the firearm for protection because he sells shoes, and
that he had been robbed previously. Id.

During his testimony, Marshal Schiff identified the
recording of his interview of the defendant, which was
mistakenly recorded at a rapid speed and without audio. Tr. 156-
57. Marshal Schiff also identified another version of the
recording, which had been slowed down to approximate normal
speed. Tr. 159-63. The second version showed the Miranda rights
card, Marshal Schiff's outline, and Marshal Schiff reading the
Miranda rights card to the defendant and advising the defendant
that he was being recorded. Tr. 160-63.

Finally, Marshal Schiff testified to receiving the fanny
pack with the firearm at the courthouse. Tr. 165, 188. He opened
the fanny pack and took photos of the firearm. Tr. 165-67. He
then completed a chain of custody form during the inventory
process -- describing the make and model of the firearm,
identifying the firearm's serial number, and reading other
identifying information engraved on the firearm before storing
the firearm in a secure location. Tr. at 179-85. Marshal Schiff
testified that the firearm admitted into evidence at the hearing

was the same firearm that he provided to the NYPD for forensic analysis on June 28, 2022. Tr. 184, 211.

Investigator Joseph Lively testified for the defense that there were various video cameras in the area. Tr. 228-45. However, no video surveillance of the defendant's arrest was ever produced by either party. Moreover, none of the officers who testified was wearing a body camera at the time of the defendant's arrest. Tr. 24, 125.

## II.

The defendant now moves to suppress the firearm recovered from the fanny pack on his person, as well as the statements he made after he was arrested because, the defendant argues, the Government obtained this evidence in violation of his constitutional rights. More specifically, the defendant argues that: (i) the Task Force lacked reasonable suspicion to conduct an investigatory stop and frisk of the defendant; (ii) the Task Force's conduct was a de facto arrest immediately upon approaching the defendant for which the Task Force lacked probable cause; (iii) the Task Force lacked probable cause to search the defendant's effects; and (iv) the statements made by the defendant were not knowing, intelligent, and voluntary, and are the fruits of the prior allegedly unconstitutional conduct. While the defendant initially argued that his statements to Marshal Schiff at the courthouse were made in violation of his

10

<u>Miranda</u> rights, the defendant did not press that argument after the evidentiary hearing, and it is plain that Marshal Schiff read the defendant his <u>Miranda</u> rights and the defendant voluntarily chose to waive those rights and provide a voluntary statement.

**A.**

The defendant seeks to suppress the firearm seized from him, arguing that the Task Force lacked reasonable suspicion to conduct the investigatory stop at which the firearm was seized. However, the Task Force had reasonable suspicion and lawfully conducted the investigatory stop and subsequent frisk.

Pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), law enforcement officers may conduct a temporary investigative stop, consistent with the Fourth Amendment, with less than probable cause. However, "[t]o conduct a <u>Terry</u> stop -- that is, a temporary detention of an individual -- a police officer must have reasonable suspicion that the individual has engaged in or is about to engage in criminal activity."[1] <u>United States v. Hawkins</u>, 37 F.4th 854, 857 (2d Cir. 2022). Reasonable suspicion is less than probable cause, and must be established by "specific and articulable facts which, taken together with

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

11

rational inferences from those facts, reasonably warrant the intrusion." Id. And the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Reasonable suspicion is determined from the "totality of the circumstances." Hawkins, 37 F.4th at 858.

After stopping a suspect upon reasonable suspicion, an officer may conduct a protective search for weapons if the officer has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. In other words, "[t]o support an accompanying frisk for weapons, the officer must also have reasonable suspicion that the person subjected to the frisk is armed and dangerous." Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016). An "officer need not be absolutely certain that the individual is armed." Terry, 392 U.S. at 27. Rather, it is sufficient if an officer is aware of articulable facts suggesting that an individual may be armed and dangerous. See United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (pat-down search is warranted so long as "the person stopped may be armed and presently dangerous"). This standard "is not a difficult one to satisfy, for even if the belief that the suspect might be carrying a weapon rest[s] upon fragile grounds[,] . . . courts should not set the test of

12

sufficient suspicion that the individual is armed and presently
dangerous too high when protection of the investigating officer
is at stake." United States v. Oates, 560 F.2d 45, 63 (2d Cir.
1977); see also United States v. Jackson, 652 F.2d 244, 247 (2d
Cir. 1981) (finding reasonable suspicion despite a difference in
weight of fifty pounds and difference in clothing between the
defendant and the wanted suspect).

In this case, the defendant's description sufficiently
matched that of Mr. Gamble, the wanted suspect. Detective
Parchen identified the defendant as possibly the person the Task
Force was searching for, given the defendant's physical
characteristics and location. Tr. 28-29, 75, 140. Marshal Karoly
confirmed that the defendant matched the description of the
person the Task Force was looking for before stopping the
defendant, and the defendant then appeared to try to sprint when
approached by Marshal Karoly. Tr. 83, 118-19. Significantly, the
Task Force members' mistaken belief that the defendant was Mr.
Gamble was reasonable because the defendant had sufficiently
similar physical characteristics, including race, age, height,
and weight; was located in a place where the Task Force had
reason to believe Mr. Gamble would be found; and rocked as if to
sprint when approached by a law enforcement officer. The one-to-
two-inch difference in height, twenty-pound difference in
weight, and slight differences in facial hair and skin tone --

13

especially from a distance of tens of feet -- were insufficient
to undercut all of the other factors that created reasonable
suspicion, particularly when coupled with the fact that the
defendant was at the place where the fugitive suspect was
expected to be. See, e.g., Jackson, 652 F.2d at 247.

Marshal Karoly also had a reasonable suspicion that the
defendant was armed and dangerous and therefore had reason to
frisk the defendant. Masrhal Karoly was aware that the suspect
was wanted for a non-fatal shooting and had a history of prior
arrests for robberies, firearms possessions, and assaults on
police officers. Detective Parchen had advised the Task Force
that the suspect was "prone to violence" and described him as a
"fighter, fleer, and a shooter." Tr. 29, 75, 114. Given all of
these facts, Marshal Karoly had sufficient articulable facts
from which to believe that the suspect was armed and dangerous.
Accordingly, a frisk for weapons was justified as part of the
Terry stop.

**B.**

The defendant also argues that the Task Force's conduct in
approaching the defendant constituted a de facto arrest without
probable cause in violation of the Fourth Amendment. This
argument is without merit. The evidence demonstrates that the
Task Force members used only reasonable force in connection with
the Terry stop and did not convert the stop into an arrest. The

14

stop and frisk was converted into an arrest only after the
firearm was found.

"[A]n encounter that began as a . . . Terry stop may have
ripened into an arrest . . . if, for example, the officers
unreasonably used means of detention that were more intrusive
than necessary." United States v. Perea, 986 F.2d 633, 644 (2d
Cir. 1993). In determining whether the means of detention were
sufficiently intrusive, the Second Circuit Court of Appeals has
considered the risk of danger presented by the person stopped
and the physical force used against that person (including
firearms, handcuffs, and leg irons), as well as the length of
time of the stop, its public or private setting, and the number
of participating law enforcement officers. See United States v.
Patterson, 25 F.4th 123, 140-41 (2d Cir. 2022). Moreover, the
Second Circuit Court of Appeals has stressed the importance of
considering the "immediate interest of the police officer in
taking steps to assure himself that the person with whom he is
dealing is not armed with a weapon . . . ." Id. at 142.

In view of the violent crime for which Mr. Gamble was a
suspect and his prior convictions, Marshal Karoly used
reasonable force in connection with the Terry stop and did not
convert it into an arrest when he approached the defendant.
Marshal Karoly had sufficient cause to conduct a frisk because
he had reasonable suspicion to believe that the defendant was

Mr. Gamble and therefore armed, given the offense for which Mr.
Gamble was sought and his prior convictions. Tr. 28-29. A single
officer, Marshal Karoly, conducted the frisk on a public street.
He did not place the defendant in handcuffs, and the encounter
lasted only a brief time before Marshal Karoly found the
firearm. The stop and frisk converted into an arrest only after
Marshal Karoly found the firearm, when the other Task Force
members approached the defendant and handcuffed him, and Marshal
Karoly seized the fanny pack. Tr. 94-95.

### c.

The defendant also moves to suppress the physical evidence
because, he argues, the Task Force lacked probable cause to
search the defendant's effects. The argument is also without
merit.

The "plain feel" doctrine provides that law enforcement
officers may seize evidence perceptible by touch --
notwithstanding being in a closed container -- during a lawful
Terry frisk. See, e.g., Minnesota v. Dickerson, 508 U.S. 366,
375 (1993); United States v. Ocampo, 650 F.2d 421, 429 (2d Cir.
1981). Additionally, plainly felt evidence may also give rise to
probable cause to arrest. See, e.g., United States v. Carrero,
No. 98-cr-959, 1999 WL 97906, at *5 (S.D.N.Y. Feb. 24, 1999).

The Task Force had probable cause to seize the fanny pack
with the firearm and arrest the defendant. Marshal Karoly has

16

thirty years of extensive experience with firearms, including revolvers (the particular type of firearm the defendant possessed). Tr. 57, 67-68, 123. Marshal Karoly testified credibly that he knew immediately that what he felt in the fanny pack was a handgun.

The fact that there were other objects in the fanny back does not undermine the existence of probable cause. There is no evidence that the other objects in the fanny pack -- the defendant's keys and cell phone -- negated the plain feel of the firearm perceptible from the exterior of the fanny pack. Tr. 123. Furthermore, it was not necessary in that moment for Marshal Karoly to ascertain that the gun was not some innocent facsimile of an illegal firearm. Cf. United States v. Hagood, 22-cr-588, 2023 WL 5597832 (2d Cir. Aug. 30, 2023)(officer was not required to negate other possibilities before conducting a Terry frisk when the officer perceived a firearm in a fanny pack without touching it); see also United States v. Weaver, 9 F.4th 129, 149 (2d Cir. 2021).

In summary, given the circumstances, the Task Force conducted a proper investigatory stop and frisk, which converted into a lawful arrest once Marshal Karoly felt the firearm inside the defendant's fanny pack and the Task Force placed the defendant in handcuffs. The law enforcement officers then had probable cause to seize the fanny pack with the firearm and had

probable cause to arrest the defendant for unlawfully possessing the firearm. The defendant points to some discrepancies in the testimony, but those discrepancies are insufficient to undercut the credibility of the Government's witnesses. The firearm was not seized in violation of the Fourth Amendment, and the defendant's motion to suppress the firearm is **denied.**

### D.

The defendant also moves to suppress the statements he made after his arrest, on the grounds that those statements were not knowing, intelligent, and voluntary, and were the fruits of the poisonous tree of his allegedly unlawful arrest and seizure of the firearm. This argument is also without merit.

As to the statements the defendant made in Marshal Schiff's vehicle while being transported to the courthouse, the defendant has not explicitly argued that those statements should be suppressed. In any event, there is no evidence that those statements were involuntarily made. The Second Circuit Court of Appeals "evaluate[s] voluntariness based on the totality of the circumstances, including . . . the conditions of the interrogation, and . . . the conduct of law enforcement officials." United States v. Kourani, 6 F.4th 345, 351-52 (2d Cir. 2021). In this case, there was no interrogation. Marshal Schiff testified that, as he transported the defendant, the defendant voluntarily offered statements that his probation

officer was going to be upset with him and that he carried the firearm for protection because he had been robbed previously. Tr. 144-45. As to the conduct of the relevant law enforcement official, Marshal Schiff testified that he did not ask the defendant any questions in the vehicle. Id. There is no evidence to the contrary, and there is no basis to suppress those statements.

As to the statements the defendant made at the courthouse, the evidence establishes that the defendant made those statements after Marshal Schiff gave the defendant Miranda warnings. Marshal Schiff testified that he printed the USMS form Miranda card before interviewing the defendant, and the video of the interrogation shows Marshal Schiff displaying the Miranda card to the defendant. Tr. 150-51, 160-63. Marshal Schiff also testified that he prepared an outline for the interrogation which began with "rights," and that outline is visible in the video recording. Tr. 150, 160-63. The defendant has not pressed his original argument that his statements were taken in violation of his Miranda rights and there is no evidence to support such an argument. Similarly, there is no basis to conclude that his statements were coerced or involuntary. There is no evidence of the use of any compulsion against the defendant. To the extent the defendant argues that any statements should be suppressed because they were the fruit of

19

an unlawful search and seizure, the argument is without merit because there is no evidence of an unlawful search or seizure.

Therefore, the defendant's motion to suppress the statements he made after his arrest is **denied**.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to suppress the physical evidence recovered at the time of his arrest as well as the statements he made is **denied**.

**SO ORDERED.**

Dated:     New York, New York
           September 7, 2023
                                          _____
                                              John G. Koeltl
                                          United States District Judge